The People of the State of New York Respondent, v Howard J. Vance, Appellant.

Fourth Department, November 9, 1982

APPEARANCES OF COUNSEL

*Damon, Morey, Sawyer & Moot (Terrance Connors* of counsel), for appellant.

*Richard J. Arcara (Deborah Sorbini* of counsel), for respondent.

OPINION OF THE COURT

Schnepp, J.

In this case, where a close issue of fact existed as to the defendant's guilt, conduct at trial which allowed the prosecutor to become an "unsworn witness" created a substantial likelihood of prejudice to the defendant (see *People v Paperno,* 54 NY2d 294). The prosecutor became directly involved during the trial in the gathering of rebuttal evidence, and referred to his involvement during the presentation of the evidence and in his summation. We hold that this conduct impermissibly tipped the scales of justice and deprived defendant of a fair trial and for this reason reverse defendant's first degree robbery conviction and order a new trial.

On April 5, 1980 at approximately 8:30 P.M. a convenience store located approximately one-half mile from defendant's house was robbed by a lone gunman who left the

store by foot and proceeded in the direction of defendant's house. The cashier was the only person in the store at the time of the robbery and she recognized the robber as the defendant whom she knew as a customer of the store. Defendant, his sister and father, however, claimed that he was home when the crime occurred. The sister said that she saw him at about 8:25 P.M. as he put oil in his father's car. When he was finished, he came inside the house, made some tea in the kitchen and then went to his downstairs bedroom. The sister then decided to take a bath and requested that the defendant watch her daughter. The father testified that as he was leaving the house to pick up his wife from work he saw the defendant at 8:30 P.M. The father returned home at 9:10 P.M. and was confronted by police who told him that there had been an armed robbery and that his son fit the description of the robber. After the father explained that his son had been home and could not have been involved, the police left. They returned, however, two hours later, arrested defendant and searched the house. They did not find the gun used in the robbery, the money that was taken, or the clothing allegedly worn by the robber. A corduroy coat owned by defendant was seized by the police, but it apparently was not identified by the victim as the coat worn by the robber.

The theory of prosecution was that defendant created an alibi; that he left the house, committed the crime, and returned to the house, before the police arrived and without the knowledge of his family. According to the prosecutor, Assistant District Attorney Richard C. Panepinto, Esq., defendant availed himself of the opportunity to commit the crime at 8:30 P.M. just after his father left the house and while his sister was in the upstairs bathroom. Two pieces of evidence, however, did not mesh with this theory: first, the defendant's testimony that the store was approximately 15 minutes walking distance from his house; and second, the father's testimony that he saw defendant at home at 8:30 P.M. when the crime occurred.

In an attempt to discredit this testimony, during a weekend recess Panepinto walked from the defendant's house to the store accompanied by Detective David J. Meyer of the local police department who timed him. Both Panepinto

and Meyer also drove a route substantially shorter than that traveled by defendant's father to pick up his wife on the day of the robbery in an effort to demonstrate that the father left the house around 8:20 P.M., 10 minutes before the robbery.

When the trial reconvened Panepinto put Meyer on the stand to testify to their findings and repeatedly asked questions regarding his own conduct. Meyer testified that it took Panepinto 7 minutes to walk from the house to the store and 46 minutes for them to drive the shortened route. He also testified as to the exact route followed and the manner in which Panepinto walked from the defendant's home to the place of the crime. Panepinto's questions and Meyer's responses are replete with references to what "we" and "I" did. A particularly egregious example of this is the following:

"Q. Now, did you have an opportunity at that occasion, that being yesterday, excuse me, on March 15th, to measure the distance — excuse me, strike that. To observe the walking of the distance between 739 and the Stop-N-Go?

"A. Yes, I did.

"Q. Who did that walking?

"A. You did.

"Q. And where were you?

"A. I was in the car.

"Q. And did you observe my manner of walking?

"A. Yes * * *

"Q. Now officer, did you ever observe me to break stride or run?

"A. No, you did not.

"Q. And did I ever get back in your vehicle for part of the distance?

"A. No.

"Q. Did I walk the entire distance?

"A. Yes, you did.

"Q. Did you observe me to stop at all?

"A. No, you did not stop.

"Q. Could you tell me the time that you noted it took myself to walk that distance?

"A. Took you by my watch seven minutes.

"Q. Did I walk to the door?

"A. Yes, you did."

Later in summation Panepinto rhetorically asked why, if it only took him 7 minutes to walk from the defendant's house to the store, did the defendant testify that it took him 10 to 15 minutes. He also argued to the jury that, if it took 46 minutes to travel a route shorter than that driven by the father, it must have taken the father 50 to 55 minutes to travel his route the night of the crime, and that he must have left the house between 8:20 P.M. and 8:25 P.M., and not at 8:30 P.M. as he testified. The prosecutor then explained to the jury his theory of the case, arguing that defendant was alone at 8:30 P.M. and had plenty of time to walk to the store, commit the crime and return to the house before the police arrived. He told the jury that defendant did not wear a mask during the robbery because he knew that he had a "tailor-made" "airtight" alibi, i.e., his family would testify that he was home when the crime occurred.

When a prosecutor refers during trial to his involvement in gathering evidence for the case he becomes an "unsworn witness" against the defendant (*People v Paperno,* 54 NY2d 294, *supra;* see, also, *People v Ortiz,* 54 NY2d 288). If defendant can demonstrate a substantial likelihood of prejudice flowing from these references, his conviction must be reversed (*People v Paperno, supra,* p 304). In *Paperno,* the Court of Appeals explained that a substantial likelihood of prejudice occurs when the prosecutor's conduct "in fact becomes a material issue at the trial and his conduct at the trial improperly allowed him to become an unsworn witness against the defendant, thereby causing the defendant to suffer such a likelihood of prejudice". (*People v Paperno, supra,* p 304.)

*People v Ortiz* (54 NY2d 288, *supra*) provides an instructive application of this rule. In *Ortiz* the defendant gave two confessions; the District Attorney being involved in the taking of the second statement only. At trial defense

counsel focused on the circumstances surrounding the taking of the first confession in arguing that the confessions were involuntary. It was never claimed that the prosecutor coerced or intimidated the defendant at the time of the taking of the second statement. The Court of Appeals held that, although the prosecutor should not have referred at trial to his role in the taking of the second statement, the defendant had not demonstrated a substantial likelihood of prejudice from the prosecutor's involvement in the case because his conduct never became, in actuality, a material issue in the case.

In this case the opposite is true. The prosecutor made his out-of-court conduct in gathering rebuttal evidence a material issue in the case. The theory of prosecution was premised upon findings which emanated from his personal involvement in producing trial testimony, and he directly attacked the credibility of defendant and his father based upon the evidence that he gathered. In presenting the evidence the prosecutor made his involvement in the case so unmistakably clear to the jury, that his credibility became as much an issue in the case as the credibility of any witness.

It is, of course, for thè jury to decide the significance and weight of identification and alibi testimony. The court, however, has the duty to ensure that the integrity of the fact-finding process is not violated. In a case such as this where credibility is the only issue, a prosecutor who oversteps the bounds of legitimate advocacy and makes himself an "unsworn witness" against the defendant affects the fairness of the trial and unduly prejudices the defendant.

We have examined the remaining issues raised by defendant and find them to be without merit. Although the jury was not specifically instructed that the District Attorney had the burden to disprove the alibi defense beyond a reasonable doubt (see Penal Law, § 25.00, subd 1; see, also, *People v O'Neill,* 79 AD2d 429) the charge taken as a whole was proper and no burden of proof was placed on defendant.

Accordingly, we reverse the judgment of conviction and order a new trial.

DILLON, P. J., SIMONS, DOERR and MOULE, JJ., concur.

Judgment unanimously reversed, on the law and facts, and new trial granted.